[No. G041990. Fourth Dist., Div. Three. July 8, 2010.]

DONALD R. RODEN, Plaintiff and Appellant, v.
AMERISOURCEBERGEN CORPORATION, Defendant and Appellant.

**COUNSEL**

Richard E. Hodge, Inc., and Richard E. Hodge for Plaintiff and Appellant.

O'Melveny & Myers, Gordon E. Krischer, Adam J. Karr and Jessica B. Hardy for Defendant and Appellant.

**OPINION**

**MOORE, J.**—We now have before us Donald R. Roden (Roden) and AmerisourceBergen Corporation (AmerisourceBergen) in the fourth round of their dispute concerning Roden's entitlements arising out of his employment termination. In the third appeal, we addressed a postjudgment order concerning retirement benefits, a severance payment, a stock option award, and loan forgiveness. As concerns the retirement benefits, we reversed the portions of

the postjudgment order with respect to the amount of the change in control benefit and the amount of any excise taxes and resultant income taxes owing to Roden under the company's supplemental executive retirement plan (SERP). "We remand[ed] those issues to the trial court with directions to further remand them to the plan administrator for determination in the first instance." (*Roden v. AmerisourceBergen Corp.* (2007) 155 Cal.App.4th 1548, 1552 [67 Cal.Rptr.3d 26] (*Roden III*).)

On remand, the trial court rejected the determination of the administrative review official to the effect that Roden was entitled to a change in control benefit in the amount of $7,503,300. The court awarded Roden a change in control benefit in the amount of $14,432,141.74 instead. However, it affirmed the determination of the administrative review official to the effect that Roden was not entitled to an additional amount for excise taxes and resultant income taxes. AmerisourceBergen appeals from those portions of the order pertaining to the amount of the change in control benefit, the postjudgment interest rate applied, and the manner of application of payments made towards principal and interest. Roden also appeals, seeking to overturn the portions of the order pertaining to the prejudgment interest rate, the date from which postjudgment interest begins to accrue, the denial of his request for excise taxes and resultant income taxes, and the denial of his request for attorney fees and costs.

We hold that the trial court erred in concluding the review official had abused his discretion in calculating the amount of Roden's change in control benefit. The review official properly followed actuarial principles, methods and assumptions found to be appropriate by the plan actuary. We reverse the portion of the order overturning the review official's award and awarding Roden a $14,432,141.74 change in control benefit. We remand the matter to the trial court with instructions to modify its order to affirm the review official's determination of the change in control benefit, as expressed in his February 6, 2009 order.

The trial court was correct in affirming the decision of the review official to the effect that Roden is not, at this time, entitled to any payment with respect to potential excise tax liability. It would result in an absurdity to construe the SERP as requiring the payment of over $8 million with respect to excise taxes that are extremely unlikely ever to become due. Furthermore, as the review official held, and AmerisourceBergen has agreed, in the unlikely event excise taxes ever do become due, AmerisourceBergen will indemnify Roden as required by the SERP.

The trial court also did not err in affirming the decision of the review official as to the application of prejudgment interest at the federal bank discount rate. Federal law controls with respect to the application of prejudgment interest to benefits paid under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.), and Roden has not shown that the review official erred in his application of Ninth Circuit law in the determination of that interest rate.

We further hold the trial court did not err in applying the state statutory postjudgment interest rate. Postjudgment interest, unlike prejudgment interest, is not a part of the ERISA benefit, and there is no reason to apply the federal statutory postjudgment interest rate to a state court judgment. The trial court was also correct in applying postjudgment interest from the date of the order that is the subject of this fourth appeal. As we held in *Roden III, supra*, 155 Cal.App.4th 1548, Roden's legal entitlement to a change in control benefit was established in the order that was the subject of the third appeal, but the trial court had no authority, at the time it made that order, to award damages. (*Id.* at p. 1551.) It was not until after the plan administrator, on remand, had determined the amount of the change in control benefit in the first instance, and the matter had gone through the administrative review process, that the court first had the authority to award damages. No money judgment was properly entered with respect to the change in control benefit until the order that is the subject of this fourth appeal was entered on April 9, 2009. Postjudgment interest runs from that date.

We also hold that the trial court did not err in providing that payments made pursuant to the order, which is in essence a money judgment, are to be applied first to interest and then to principal. This mandate is consistent with Code of Civil Procedure section 695.220. However, two sizeable payments were made to Roden before the date of the order, and the rules on application of payments to a money judgment are inapplicable to those two payments.

Finally, the trial court did not err in declining to award Roden attorney fees and costs. It did not abuse its discretion in concluding that neither party was the prevailing party at trial.

We affirm in part, reverse in part, and remand.

I

FACTS

A. *Prior Appeals*

" 'As discussed in our [first] opinion, Bergen hired Roden as its president and chief operating officer in 1995. [Citation.] Roden later became chief

executive officer. Bergen terminated Roden's employment in 1999 and a disagreement ensued concerning Roden's rights under his employment contract and the company's benefit plans. Rancorous litigation followed. [Citation.]' [Citation.]" (*Roden III, supra*, 155 Cal.App.4th at p. 1552.)

" 'The matter [first] came to this court on the interpretation of a Code of Civil Procedure section 998 settlement agreement that had been reduced to judgment. The judgment required, inter alia, the payment to Roden of $5 million . . . and the continuation of certain benefits as provided in section 5 of Roden's employment contract. [Citation.] We affirmed the postjudgment order at issue. [Citation.] In doing so, we stated, "Bergen agreed to pay a $5 million lump sum to get rid of the litigation, and to continue the section 5 employment benefits, including retirement benefits." [Citation.]' [Citation.]" (*Roden III, supra*, 155 Cal.App.4th at p. 1552.)

The next time we saw the parties, they were fighting over an order permitting postjudgment discovery. That appeal ended in dismissal. (*Roden III, supra*, 155 Cal.App.4th at p. 1551.)

Judgment in hand, " 'Roden sought to collect the amounts due him . . . . However, the parties disagreed as to the amount of the employment benefits to which he was entitled.' [Citation.] Consequently, Roden filed a motion for a second postjudgment order interpreting and implementing the judgment. He sought an order regarding his rights under the company's supplemental executive retirement plan (SERP) . . . ." (*Roden III, supra*, 155 Cal.App.4th at p. 1553.) "The court awarded Roden $14,432,141.74 in SERP benefits . . . . Roden and AmerisourceBergen both appeal[ed]." (*Ibid.*)

"In [the third] appeal, . . . Roden claim[ed] the court erred in awarding him only $14,432,141.74 in employment benefits, over and above the $5 million settlement amount previously awarded . . . . In its cross-appeal, AmerisourceBergen . . . , successor by merger to Bergen Brunswig Corporation (Bergen),[1] counter[ed] that the court erred in awarding the additional $14,432,141.74." (*Roden III, supra*, 155 Cal.App.4th at p. 1551.)

In the third appeal, we held that "[t]he trial court did not err in determining that Roden was entitled to a change in control benefit under the retirement plan. However, the court did err in calculating the amount of that benefit. The benefit amount must be determined in the first instance by the retirement plan

---

[1] "Bergen merged with AmeriSource Health Corporation on August 29, 2001. The resultant entity is known as AmerisourceBergen Corporation." (*Roden III, supra*, 155 Cal.App.4th at p. 1551, fn. 1.)

administrator, not by the trial court. It is also the province of the plan administrator to determine in the first instance whether the terms of the retirement plan require the employer to pay excise and/or income taxes with respect to the change in control benefit. To the extent the court made a decision with respect to such taxes, the court erred." (*Roden III, supra*, 155 Cal.App.4th at p. 1551.)

"Accordingly, we affirm[ed] the portions of the order holding that Roden was entitled to a change in control benefit . . . . We reverse[d] the portions of the order concerning the amount of the change in control benefit, and the amount, if any, of excise and/or income taxes owing to Roden under the retirement plan. We remand[ed] those issues to the trial court with directions to further remand them to the plan administrator for determination in the first instance." (*Roden III, supra*, 155 Cal.App.4th at p. 1552.)

B. *Proceedings on Remand After Third Appeal*

On remand, Roden demanded $14,432,141.74 for the change in control benefit, minus the amount of a partial payment he had received. He also demanded reimbursement for any excise taxes, and resultant income taxes, for which he might become liable with respect to the change in control benefit. In addition, he requested attorney fees and costs. Finally, he claimed interest at the rate of 10 percent per annum from August 29, 2001.

By letter of June 10, 2008, claims official Donna Dasher denied Roden's claim. She stated: "I have determined that pursuant to the SERP you should be awarded a [change in control] benefit in the amount of $6,876,487, less the $1,898,066 already paid to you by Wachovia in July 2004, plus interest on the [change in control] benefit (less the $1,898,066 Wachovia payment) from August 29, 2001, to present at the rate specified by 28 U.S.C. § 1961(a)." The claims official also stated: "It is my further determination that you are not entitled to any gross[-]up payment to compensate for Internal Revenue Code ('Code') Section 4999 excise taxes, as you are not a 'disqualified individual' subject to the Section 4999 excise tax within the meaning of Code Section 280G(c). Therefore, you cannot reasonably be expected to become liable for the excise tax for which any gross-up payment is intended to compensate. As your claims have been denied, I have also determined that you are not entitled to any award of attorneys' fees under the Fourth SERP, Section 10.8, which provides that attorneys' fees shall only be awarded in the event a claim is granted by the Plan Administrator."

Roden filed an administrative appeal. The matter was once again heard before the Honorable Eugene F. Lynch, retired, as the review official. In a 21-page interim statement of decision dated October 31, 2008, the review

official concluded: "1. In calculating Claimant's [change in control] benefit pursuant to Section 5.1, the term Equivalent refers to the *actuarial* Equivalent as defined in Section 2.14, and thus the Plan actuary properly discounted his benefit to [its] present value based on Claimant's actual age (i.e. 54[]) at the time of the [change in control]. [¶] . . . [¶] 4. Claimant is *not* entitled to an excise tax gross-up payment pursuant to Section 5.1(b)(iii). If there is such a tax respondent of [course] would have the duty of indemnity. [¶] 5. Claimant will be awarded interest for the time period he was without his [change in control] benefit at the federal bank discount rate. . . ."

In the interim statement of decision, the review official observed that "the parties [had] agreed that once a ruling was issued on the various disputes that they would be able among themselves to agree on the exact amount owed and [would] submit such a stipulation re: said amounts to the Review Official. . . ." In a subsequent order dated February 6, 2009, he stated that the plan actuary, implementing the rulings contained in the interim statement of decision, had calculated the change in control benefit, "which amounted to $7,503,300, and applying compounded interest at the federal discount rate from August 29, 2001 to November 24, 2004 (less offsets), [had] determined the total net lump sum payment to be awarded Roden to be $6,954,305."

Dissatisfied, Roden filed, in the superior court, a motion for a third order in implementation of judgment. He challenged portions of the calculations of the SERP change in control benefit, sought interest on his benefit at the rate of 10 percent per annum from the date of the merger, and further sought a gross-up payment with respect to excise taxes.

The court awarded Roden SERP benefits in the amount of $14,432,141.74, plus interest thereon at the federal bank discount rate from August 29, 2001 through the date of the order, less the amount of any prior payments to Roden. The court further ordered that the award would bear interest at the rate of 10 percent per annum until paid. The court affirmed the review official's decision with regard to excise taxes. In addition, the court denied attorney fees and costs.

AmerisourceBergen filed an appeal from the third order in implementation of judgment and Roden filed a cross-appeal. In addition, Roden filed a motion to augment the record, to which AmerisourceBergen has filed objections.

## II

## DISCUSSION

### A. *Motion to Augment*

As a preliminary matter, we address Roden's motion to augment. He seeks to augment the record with a copy of the 2009 W-2 wage and tax statement issued by AmerisourceBergen with respect to the change in control benefit paid to him. AmerisourceBergen opposes the motion contending, inter alia, that the record on appeal cannot be augmented to include items that were not before the trial court. AmerisourceBergen is correct. The W-2 form was issued after the third order in implementation of judgment was entered and, indeed, after this appeal was filed. We do not consider matters that were not before the trial court. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) The motion to augment is denied.

### B. *Standard of Review*

#### (1) *Introduction*

We start off with much ado about the standard of review. "We review de novo a district court's choice and application of the standard of review to decisions by fiduciaries in ERISA cases. [Citation.] We review for clear error the underlying findings of fact. [Citation.]" (*Abatie v. Alta Health & Life Ins. Co.* (9th Cir. 2006) 458 F.3d 955, 962; accord, *Montour v. Hartford Life & Acc. Ins. Co.* (9th Cir. 2009) 588 F.3d 623, 629 (*Montour*).)

The big question here is the standard of review to apply to the determinations of the review official. Taking the same positions they did in the third appeal, AmerisourceBergen says the abuse of discretion standard of review applies, while Roden contends the de novo standard of review applies. (*Roden III, supra*, 155 Cal.App.4th at pp. 1558–1559.) The answer is not a simple one and, in this case, varies depending on the particular determination at issue. We begin our analysis with a review of the principles we noted in our third opinion, since it appears that there has been some misunderstanding, even on the part of the trial court, as to the scope of our holding therein with respect to the applicable standard of review.

#### (2) Firestone *rule*

"While the parties agree that the SERP is governed by the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.),

they nonetheless disagree as to the standard of review applicable to the administrative decisions at issue here. . . . Both parties cite *Firestone Tire & Rubber Co. v. Bruch* (1989) 489 U.S. 101 [103 L.Ed.2d 80, 109 S.Ct. 948] in support of their positions." (*Roden III, supra,* 155 Cal.App.4th at pp. 1558–1559.)

"That case addressed the standard of review applicable to certain challenges to benefit denials under ERISA-governed plans, in particular challenges brought under 29 U.S.C. § 1132(a)(1)(B). [Citation.] That section 'allows a suit to recover benefits due under the plan, to enforce rights under the terms of the plan, and to obtain a declaratory judgment of future entitlement to benefits under the provisions of the plan contract.' [Citation.] The *Firestone* court held 'that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' [Citation.]" (*Roden III, supra,* 155 Cal.App.4th at p. 1559.)

"Interpreting *Firestone Tire & Rubber Co. v. Bruch, supra,* 489 U.S. 101, the court in *Abatie v. Alta Health & Life Ins. Co.* (9th Cir. 2006) 458 F.3d 955, stated that 'if the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion. [Citation.]' (*Abatie v. Alta Health & Life Ins. Co., supra,* 458 F.3d at p. 963[; accord, *Conkright v. Frommert* (2010) 559 U.S. ___, ___ [176 L.Ed.2d 469, 130 S.Ct. 1640, 1646]].) '[F]or a plan to alter the standard of review from the default of de novo to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator. [Citation.] The essential first step of the analysis, then, is to examine whether the terms of the ERISA plan unambiguously grant discretion to the administrator. Accordingly, we first turn to the text of the plan.' [Citation.]" (*Roden III, supra,* 155 Cal.App.4th at p. 1559.)

(3) *Discretionary authority under SERP section 7.5, now inapplicable*

"In the case before us, SERP section 7.5 unambiguously gives the plan administrator the discretion to construe the terms of the SERP and specifically states that an arbitrary and capricious standard of review shall apply. However, section 7.5 concludes with the following language: 'This Section shall cease to apply upon the occurrence [of] a Change in Control . . . and it shall thereafter never be reinstated in any way.' " (*Roden III, supra,* 155 Cal.App.4th at p. 1559.)

"Up until the time of the merger, then, the plan administrator clearly had a discretionary authority, under SERP section 7.5, that would have been subject to the abuse of discretion standard of review. Once the merger took place, however, SERP section 7.5 became inapplicable." (*Roden III, supra,* 155 Cal.App.4th at p. 1559.) In the third appeal, AmerisourceBergen argued that, after the date of the merger, the provisions of the "Master Trust Agreement for Bergen Brunswig Corporation Executive Deferral Plans" dated December 27, 1994 (Master Trust Agreement) governed and gave rise to an abuse of discretion standard of review. Roden disagreed. (*Id.* at pp. 1553–1554, 1559–1560.) We determined that we did not need to resolve the issue because, unlike the situation in *Firestone Tire & Rubber Co. v. Bruch, supra,* 489 U.S. 101, we were not then addressing the standard of review to be applied when the question was the interpretation of an ERISA plan provision, but rather were addressing "the interpretation of a state court judgment encapsulating a Code of Civil Procedure section 998 settlement agreement, a postjudgment order implementing the judgment, [and] an appellate court opinion addressing both the judgment and the order." (*Roden III, supra,* 155 Cal.App.4th at p. 1560.)

Interestingly, in this fourth appeal, AmerisourceBergen does not renew its arguments concerning the effect of the Master Trust Agreement, and Roden does not mention the document either. However, Roden reminds us that we previously stated SERP section 7.5, granting the plan administrator certain discretionary authority, became inapplicable once the merger took place. (*Roden III, supra,* 155 Cal.App.4th at p. 1559.) Reinforcing this statement, Roden also points out that another SERP provision, subsection 5.1(b)(iv), additionally declared that SERP section 7.5 became inapplicable upon the change in control. Consequently, he maintains, in this fourth appeal, that the de novo standard of review must apply. While it is true that SERP section 7.5 is now inapplicable, it is not the only plan provision concerning the plan administrator's discretionary authority.

(4) *Disretionary authority under SERP section 2.14, affecting change in control benefit*

In our third opinion, after we concluded that the judgment entitled Roden to a SERP change in control benefit, we turned to address the proper calculation of that benefit. (*Roden III, supra,* 155 Cal.App.4th at p. 1563.) We stated: "As we have already discussed, when an ERISA plan unambiguously confers discretionary authority on the plan administrator to determine benefits or to interpret plan provisions, we apply an abuse of discretion standard of review to his or her decision. (*Abatie v. Alta Health & Life Ins. Co., supra,*

458 F.3d at p. 963.) At this juncture, we are no longer talking about interpreting the provisions of either the judgment or the first implementation order—a judicial function. Now, we are talking instead about interpreting the complex SERP provisions concerning benefits calculations, based on certain actuarial principles, methods and assumptions. In this context, SERP section 2.14 clearly vests discretion in the plan administrator to determine the actuarial equivalent of the Executive Participant's vested accrued benefit under SERP subsection 5.1(b)(i)(F), based on principles, methods and assumptions proffered by the plan actuary. In short, the abuse of discretion standard of review applies with respect to the plan administrator's determination of the actuarial equivalent in question. However, we have no plan administrator's determination to review. Because the plan administrator concluded that Roden was not entitled to a change in control benefit, it did not interpret the SERP provisions pertaining to the change in control benefit calculation." (*Roden III, supra,* 155 Cal.App.4th at pp. 1565–1566.)

We concluded that we had no choice but to "remand the matter of the change in control benefit calculation to the trial court with direction for it to further remand the matter to the plan administrator for determination in the first instance. [Citations.]" (*Roden III, supra,* 155 Cal.App.4th at p. 1566.) Although we did not review the amount of the change in control benefit, we did determine the standard of review with respect to the determination of that one benefit. The abuse of discretion standard applies, given the unambiguous grant of discretionary authority upon the plan administrator in SERP section 2.14. It is important to note that, in the third appeal, we did not determine the standard of review to be applied with respect to the determination of any other benefit.

(5) *Discretionary authority under SERP subsection 5.1(b)(iii), affecting tax benefits*

SERP section 2.14 does not apply with respect to every issue we are addressing in this fourth appeal. The section defines the term "Equivalent" for the purposes of the SERP, but that term is not at issue in SERP subsection 5.1(b)(iii), pertaining to excise taxes and resultant income taxes. Since SERP section 2.14 has no bearing on the determination of tax benefits, we must take a separate look at the standard of review applicable to that determination.

SERP subsection 5.1(b)(iii) does not give the plan administrator the discretionary authority to interpret its terms. So, to the extent we must resolve whether the terms of SERP subsection 5.1(b)(iii) provide Roden with any benefit at all, we must apply the de novo standard of review to the interpretation of those terms.

If Roden is entitled to a benefit under SERP subsection 5.1(b)(iii), the review of the determination of the amount of that benefit is another matter. Subsection 5.1(b)(iii) provides: "In the event that the Company and the Executive Participant are unable to agree upon the amount of the payment required under this subsection (iii), such amount shall be determined by Tax Counsel . . . . The decision of such Tax Counsel shall be final and binding upon both the Company and the Executive Participant. . . ." This language unambiguously grants discretionary authority to tax counsel to make the final determination with respect to the amount of the payment to be made to the executive participant with respect to excise taxes and resultant income taxes. Consequently, the abuse of discretion standard applies to a review of tax counsel's determination on that topic.

(6) *Effect of conflict of interest*

In this fourth appeal, Roden raises a new argument with respect to the abuse of discretion standard of review. He contends that even if this court determines to apply an abuse of discretion standard of review, the plan administrator's exercise of discretion must be highly scrutinized because of a conflict of interest. Roden, without citation to the record, says there is a conflict of interest because AmerisourceBergen both funds the SERP and has the authority to determine who qualifies for benefits.

We admonish Roden that we need not address any argument that is unsupported by record references. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 [115 Cal.Rptr.2d 705].) However, we nonetheless chose to check a few items in the record that, as it turns out, provide support for his assertion that there is a conflict of interest.

Section 7.4 of the SERP sets forth the claim and review procedures. Subsection 7.4(b) provides that the claim shall be determined by a claims official appointed by the plan administrator. Subsection 7.4(d) states that the claimant may appeal the decision to a review official, also designated by the plan administrator. SERP section 2.23 defines the "Plan Administrator" as Bergen Brunswig Corporation. That company, after the merger, has been supplanted by AmerisourceBergen. In the matter before us, these portions of section 7.4 were clearly implemented in the manner specified. The initial claims decision was made by claims official Donna Dasher, who provided her determination to Roden on AmerisourceBergen letterhead. AmerisourceBergen thereafter appointed Lynch to act as the review official.

It does then appear, as Roden asserts, that there was a conflict of interest inherent in the review procedure. AmerisourceBergen does not contend otherwise. However, that fact does not change the standard of review, only

the manner in which it is applied. (*Montour, supra,* 588 F.3d at p. 631.) "Abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest. But *Firestone* also makes clear that the existence of a conflict of interest is relevant to how a court conducts abuse of discretion review. In discussing abuse of discretion review, the Supreme Court cautioned that, 'if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion." [Citation.]' [Citation.]" (*Abatie v. Alta Health & Life Ins. Co., supra,* 458 F.3d at p. 965, fn. omitted.)

When "weighing a conflict of interest as a factor in abuse of discretion review [we engage in] a case-by-case balance . . . ." (*Abatie v. Alta Health & Life Ins. Co., supra,* 458 F.3d at p. 968.) The court should "tailor its review to all the circumstances before it. [Citation.] The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial [citation]; fails adequately to investigate a claim or ask the plaintiff for necessary evidence [citation]; fails to credit a claimant's reliable evidence [citation]; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." (*Id.* at pp. 968–969; accord, *Joas v. Reliance Standard Life Ins. Co.* (S.D.Cal. 2007) 621 F.Supp.2d 1001, 1007 (*Joas*).)

However, while Roden flags the existence of a conflict of interest, he does not discuss any of the factors the court should consider in evaluating how heavily to weigh that conflict of interest. He does not, for example, cite any evidence of self-dealing, malice, a stingy claims-granting history, inconsistent reasons for claims denial, failure to adequately investigate a claim, or repeatedly making decisions against the weight of the evidence in the record. (See *Abatie v. Alta Health & Life Ins. Co., supra,* 458 F.3d at pp. 968–969.) He simply declares that the plan administrator has interpreted the terms of the SERP incorrectly and urges this court to scrutinize the claim denial. He cites *Joas, supra,* 621 F.Supp.2d 1001 for the proposition that "where a plan confers discretion upon a conflicted plan administrator to interpret the plan, a district court reviews the decision of the conflicted plan administrator for an abuse of discretion, 'tempered by skepticism commensurate with the plan administrator's conflict of interest.' [Citation.]" (*Id.* at p. 1006.) However, the alleged misinterpretation of the SERP, standing alone, does not give rise to an alarming level of skepticism.

Rather, we note several factors Roden has failed to point out. Neither the claims official nor the review official failed to provide an adequate explanation of his or her decision. The claims official provided a 13-page analysis, accompanied by the actuarial analysis of Towers Perrin and opinions of tax counsel Ivins, Phillips & Barker. The review official provided a 21-page analysis. Each analysis was cogent and detailed.

It is important to observe that the actuarial firm provided the change in control calculation, and explained the actuarial basis for taking Roden's actual age into consideration in performing the computations. Towers Perrin stated that it "used the same methodology and assumptions [it had] used in calculating the monthly retirement benefit of other executives of Bergen Brunswig at the time the Change in Control provisions became effective." The claims official, in turn, stated that, in compliance with SERP subsection 5.1(b)(i)(F), she "based [her] decision on the terms of the SERP and calculations performed by the SERP Plan actuary, Julia Weyand of Towers Perrin." The claims official further stated: "Ms. Weyand of Towers Perrin, the SERP Plan actuary since 1999, has calculated your [change in control benefit] under the SERP using . . . the same 'principles, methods, and assumptions' under the SERP she used to calculate the benefits of the other executives who received a [change in control] payment at the time of the Merger in 2001." (Fn. omitted.) The claims official also remarked that Roden's "entitlement to any [change in control] benefit [was] derived from the obligation of the Company to provide benefits to [Roden] as if [he] had remained an employee. It [was], therefore, appropriate that [his change in control] benefit be calculated in the same manner as the [change in control] benefits for other executives were calculated." The reliance on a third party actuary, and the application of a consistent rule as to all persons receiving a change in control benefit, tempers the degree of skepticism applied in connection with the conflict of interest issue Roden raises.

It occurs to us that there may be one potential conflict of interest issue that Roden does not mention. That is, whether tax counsel may have a conflict of interest by virtue of having been hired by the claims official. We note that tax counsel was ostensibly hired to perform the function of a neutral third party and that SERP subsection 5.1(b)(iii) contains safeguards concerning the qualifications of tax counsel and the lack of preexisting conflicts of interest. That subsection provides in pertinent part: "As used in this subsection (iii), the term 'Tax Counsel' shall mean an attorney at law or certified public accountant who is a partner at a law firm of at least 25 attorneys or a partner at a 'Big 6' accounting firm, respectively, provided that such firm has not provided services to the Company or the respective Executive Participant or

any affiliate of the Company or such Executive Participant within the last year." The claims official hired tax counsel with the requisite qualifications.

Roden does not address whether these safeguards are sufficient to counteract any possible conflict of interest, and we will not do research on our own to further an issue Roden does not raise. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 [50 Cal.Rptr.3d 398].) Suffice it to say that we will bear in mind the possibility of a conflict of interest on the part of tax counsel as we apply the abuse of discretion standard of review.

### (7) *Other issues*

We address the standard of review to be applied in connection with other issues as those issues arise.

### C. *Change in Control Benefit*

#### (1) *Introduction*

AmerisourceBergen requests that this court reverse the trial court's award of $14,432,141.74 with respect to the change in control benefit. It further requests that we affirm the review official's award of $7,503,300, less certain offsets, plus interest, as more particularly expressed in his February 6, 2009 order. Roden argues in favor of the trial court's award and against the review official's award.

#### (2) *SERP subsection 5.1(b)(i) and section 2.14*

In the third appeal, we held that Roden was entitled to a change in control benefit under SERP subsection 5.1(b)(i). (*Roden III, supra,* 155 Cal.App.4th at pp. 1563–1564.) The amount of the benefit is dependent upon the interpretation of that provision and related section 2.14 of the SERP.

Subsection 5.1(b)(i) of the SERP provides in pertinent part: " 'Notwithstanding any other provisions of the Plan, upon the occurrence of a Change in Control . . . , each Participant's Accrued Benefit shall [be] deemed to be fully Vested . . . and each Executive Participant shall be entitled to benefits . . . in accordance with the following: (A) As of the date of the Change in Control, such Executive Participant shall be deemed to have attained the Normal Retirement Age; [¶] . . . [¶] (E) such Executive Participant's Accrued Benefit . . . shall be calculated in accordance with the assumptions set forth in the preceding clauses (A)–(D); and (F) prior to or upon the consummation of

the transactions giving rise to the Change in Control, the Company shall pay to such Executive Participant . . . a cash lump sum payment that is the Equivalent of such Executive Participant's Vested Accrued Benefit determined in accordance with this Section 5.1(b).' " (*Roden III, supra,* 155 Cal.App.4th at pp. 1556–1557, fn. 2.)

The term "Equivalent," as used in SERP subsection 5.1(b)(i), clause (F), is defined in SERP section 2.14 as " 'the actuarial equivalent of a given amount or benefit payable in another manner, at another time or by any other means, determined conclusively by, or under the direction of, the Plan Administrator in accordance with actuarial principles, methods and assumptions which are found to be appropriate by the Plan's actuary. . . .' " (*Roden III, supra,* 155 Cal.App.4th at p. 1565.) Here, the multimillion-dollar question is whether SERP section 2.14 is properly applied to take into consideration the fact that Roden was 54 years old at the time of the change in control.

### (3) *Determination of plan actuary*

In her June 10, 2008 actuarial analysis, Weyand, a principal at Towers Perrin, stated: "The determination of a lump sum payment under the Plan can be thought of as the amount of money a life insurance carrier would charge today in return for the promise to pay a specified annuity to Mr[.] Roden beginning at age 62 and continuing for his life with a reduced amount continuing to his surviving beneficiary following his death. The lump sum payment is considered to be Equivalent in value to the future stream of annuity payments."

She further stated: "At the time of the Change in Control, based on the definition of Equivalent in Section 2.14 and the provisions in [sub]section 5.1(b)(i)(A)–(F), we obtained quotes from an annuity provider for each of the Bergen Executives whose retirement benefit we had calculated. The quotes were based on the following assumptions: 1) an annuity starting at the Participant's 62nd birthday and continuing for life, . . . and 4) an Interim Period to reflect the period of time from the date of the Change in Control to the Participant's 62nd birthday, recognizing that payment of an annuity under the Plan begins at age 62 and not the Participant's current age."

Weyand said that taking the described "Interim Period" into consideration was required under actuarial principles. She explained: "[P]erforming the calculation without recognizing the Interim Period would result in significant and unintended windfalls for younger executives compared to older executives. For example, one eligible participant was 40 years old at the time of the

Change in Control. Had he been given 4% increases for 22 years and then simultaneously been treated for payment purposes as if he was already 62 so that the Interim Period was ignored, his resulting lump sum payment would have been much larger than several executives whose level of responsibility and compensation were far higher than his. That windfall and inequity confirmed our conclusion that calculating the lump sum in that manner was neither appropriate nor intended."

She concluded: "We did not obtain an annuity quote for Mr. Roden at the time of the Change in Control and historical annuity quotes are not now available. However, we did obtain an annuity quote for another eligible Executive Participant who is approximately 2 months older than Mr. Roden (the 'comparable Executive Participant'). Given their proximity in age, we believe it is reasonable to use the annuity quote for the comparable Executive Participant as a basis for converting Mr. Roden's monthly retirement benefit into a lump sum equivalent as of May 31, 2001. Using the annuity quote for a participant 2 months older than Mr. Roden provides Mr. Roden with a slightly higher lump sum payment than if his actual age were used."

### (4) *Determination of claims official*

The claims official adopted the calculations of Weyand, as the plan actuary. The claims official noted that the calculations of Roden's actuary, Adam Reese, employed a lump-sum conversion factor that was 91 percent higher than the one employed by the plan actuary. She said that "Mr. Reese's factor calculate[d] the lump-sum amount that would be necessary to purchase an annuity for [Roden] that would pay [his] monthly retirement benefit commencing at the time of the Merger (when [he was] in fact 54 years old), rather than at the time of [his] 62nd birthday. But starting the annuity earlier requires a much larger lump-sum payment because there is less time for the lump-sum to grow and accrue interest before the annuity commences."

In rejecting Reese's calculation, the claims official explained: "The Plan actuary found that it was appropriate to determine the value of the cash lump sum as being the Equivalent of a deferred annuity payable starting at Normal Retirement Age. This is consistent with payment 'at another time' as provided in the definition of Equivalent. Mr. Reese's calculation is inconsistent with the definition of Equivalent because it does not adjust for payment 'at another time.' "

### (5) *Determination of review official*

The review official explained that SERP subsection 5.1(b)(i), clause (E) requires that the accrued benefit " 'be calculated in accordance with the

assumptions set forth in the preceding clauses (A)–(D).' These assumptions have the effect of crediting the Executive Participant with his projected compensation from the date of the [change in control] until Normal Retirement Age at 62. Thus they ensure the Participant's final pay used for calculating the benefit will be the same as it would have been absent the [change in control]. However, the Accrued Benefit under the SERP is a monthly payment, not a lump sum. That is why [clause] (F) provides that in the event of a [change in control] a cash lump sum that is the Equivalent of the Accrued [B]enefit will be paid to the Participant." (Fn. omitted.)

The review official characterized the argument Roden made at the time as a claim that the accrued benefit should be converted to lump sum without a discount to present value based on his actual age at the time of the change in control. The review official rejected the argument as rewriting the term "Equivalent" out of SERP subsection 5.1(b)(i), clause (F). "In other words, there would be no point in having the term used [in subsection 5.1(b)(i), clause (F)] at all if not in reference to the definition set forth in Section 2.14."

In conclusion, the review official stated: "As [AmerisourceBergen] contends, the SERP is a *retirement* plan designed to provide retirement benefits to [its] Participants at age 62 at specified levels. [Roden] was 54 and not 62 at the time of the [change in control], and thus from a retirement and actuarial perspective needed less money to fund his retirement than an individual who was in fact age 62. As [AmerisourceBergen] points out, [Roden's] approach has the illogical effect of providing a Participant a greater age 62 retirement benefit the younger the Participant is at the time of the [change in control]. [¶] Therefore, the Review Official concludes that the Plan Official properly discounted [Roden's] age 62 [change in control] benefit to its present value at the time of the [change in control] in 2001 when [Roden] was in fact age 54."

### (6) *Third order in implementation of judgment; analysis*

The trial court correctly selected the abuse of discretion standard to apply to its review of the portion of the review official's decision pertaining to the calculation of the change in control benefit. However, for reasons we shall show, we disagree with the manner in which that standard of review was applied.

The third order in implementation of judgment states: "The Court finds that the Decision of the Review Official with regard to the calculation of the change in control benefit and the finding that the language of the SERP calls for a discount of the change in control benefit payable based on the actual age of 54 to arrive at present value is an abuse of discretion and finds that Mr. Roden should be deemed 62 years of age for the purposes of calculating the cash lump sum equivalent."

More specifically, the court explained that the review official had abused his discretion in construing the SERP provisions in a manner contrary to their plain language. The court focused on the opening clause of SERP subsection 5.1(b)(i) which provides: *"Notwithstanding any other provisions of the Plan,* upon the occurrence of a Change in Control . . . , each Participant's Accrued Benefit shall [be] deemed to be fully Vested under the Plan and each Executive Participant shall be entitled to benefits under the Plan in accordance with the following: (A) As of the date of the Change in Control, such Executive Participant *shall be deemed to have attained the Normal Retirement Age . . . ."* (Italics added.)

The court construed this language as "an absolute declaration that, in spite of anything else in the [SERP], at the date of Change in Control, the executive is deemed to be 62, the normal retirement age." In other words, his actual age is not to be taken into consideration in any regard.

However, this analysis, though it considers clause (A) of SERP subsection 5.1(b)(i), completely ignores clause (F) thereof. Consequently, we are compelled to perform a second reading of subsection 5.1(b)(i), this time including both clauses at issue. Subsection 5.1(b)(i) provides in pertinent part: "Notwithstanding any other provisions of the Plan, upon the occurrence of a Change in Control . . . each Executive Participant shall be entitled to benefits under the Plan in accordance with the following: (A) As of the date of the Change in Control, such Executive Participant shall be deemed to have attained the Normal Retirement Age; [¶] . . . [¶] *and* (F) . . . the Company shall pay to such Executive Participant, . . . *a cash lump sum payment that is the Equivalent of* such Executive Participant's Vested Accrued Benefit determined in accordance with this Section 5.1(b)." (*Roden III, supra,* 155 Cal.App.4th at pp. 1556–1557, fn. 2, italics added.)

On second reading, we see that the "notwithstanding" qualification does not elevate SERP subsection 5.1(b)(i), clause (A) over clause (F). Both clauses apply, notwithstanding any other provision of the SERP. Just as we must look outside subsection 5.1(b)(i) to find the definition of "Normal Retirement Age," in section 2.19 of the SERP, we must also look outside of subsection 5.1(b)(i) to find the definition of "Equivalent," in section 2.14 of the SERP.

SERP section 2.14 provides in full: " 'Equivalent' shall mean the actuarial equivalent of a given amount or benefit payable in another manner, at another time or by any other means, determined conclusively by, or under the direction of, the Plan Administrator in accordance with actuarial principles, methods and assumptions which are found to be appropriate by the Plan's actuary. For purposes of this Plan, equivalencies shall be based on the

mortality assumptions included in the indices used by Metropolitan Life Insurance Company, or such other nationally recognized insurance company, in quoting a premium to purchase a non-qualified individual annuity with survivor coverage *as of the date of the event necessitating the calculation* (e.g. retirement, termination of Employment, disability, etc.)." (Italics added.)

The trial court construed the phrase "the date of the event necessitating the calculation," as contained in SERP section 2.14, to mean the date of the change in control. Therefore, the court reasoned, the section 2.14 equivalency calculation must be made as of that date, and using an age of 62, without discount based on actual age. Again, we disagree. The phrase at issue notwithstanding, nothing in the last sentence of section 2.14, regarding equivalencies based on certain mortality assumptions, excludes consideration of actual age, or the time value of money.

As we have already indicated, Weyand, the plan actuary, explained the use of quotations from an annuity provider. And, the date of the change in control was a factor in the quotations obtained. Weyand also explained why actuarial principles and methods required not only the consideration of the date of the change in control, but also the participant's actual birth date. She explained the anomaly wherein, without the consideration of a participant's actual birth date, a 40-year-old executive with far less seniority and responsibility would obtain a far greater cash lump sum at the date of the change in control than a much older, higher level senior executive, were birth date not taken into consideration. To avoid this inequity, in Weyand's calculation, the plan participant was still deemed to be age 62 at the date of the change in control, for the purpose of determining the amount of compensation he would have been earning at that age were he then employed. But actuarial principles and methods nonetheless required a discount to present value given the fact that the plan participant was not in fact age 62 at the date of the change in control, when the cash lump sum payment was to be made.

We emphasize the directive of SERP section 2.14 to the effect that "the actuarial equivalent of a given amount or benefit payable in another manner, at another time or by any other means, [shall be] determined conclusively by, or under the direction of, the Plan Administrator in accordance with actuarial principles, methods and assumptions which are found to be appropriate by the Plan's actuary." The actuarial principles having been soundly described by the plan actuary, and adopted by the plan administrator and the review official, the reviewing court does not substitute its discretion for theirs. " 'Our inquiry is not into whose interpretation of the plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable.' [Citation.]" (*Winters v. Costco Wholesale Corp.* (9th Cir. 1995) 49 F.3d 550, 553.)

Roden maintains that the review official's interpretation is indeed unreasonable, and an abuse of discretion, because it clearly conflicts with the plain language of the SERP. As *Joas, supra*, 621 F.Supp.2d 1001, states, " '[a]n ERISA administrator abuses its discretion . . . if it . . . construes provisions of the plan in a way that conflicts with the plain language of the plan . . . .' [Citation.]" (*Id.* at p. 1009.)

According to Roden, the SERP required a simple two-step calculation: (1) his vested accrued benefit was to be determined as though he were 62 years old at the time of the change in control; and (2) because his vested accrued benefit would have been paid as a monthly income stream absent the change in control, the lump sum that was paid instead was to be reduced to present value. However, he insists that the plan actuary, the claims official and the review official each failed to perform that simple calculation, as required by the plain language of SERP subsection 5.1(b)(i) and section 2.14. Furthermore, he contends they violated the plain language of the SERP by applying a discount to the discount. In other words, he says that while it was proper, under standard actuarial principles, to discount the monthly income stream to present value because the benefit had to be paid as a lump sum on change in control, it was wholly unauthorized by the provisions of the SERP to superimpose a second discount to present value on top of the first one, on account of his age at the time of the change in control.

It is true that neither SERP subsection 5.1(b)(i) nor section 2.14 mentions a double discount. But subsection 5.1(b)(i), clause (F) requires an "Equivalent," within the meaning of section 2.14, to be paid, and section 2.14, in turn, requires equivalencies to be determined in accordance with actuarial principles, methods and assumptions specified by the plan actuary. Like it or not, the plan actuary had to address two separate issues: (1) the issue of the payment of the vested accrued benefit as a lump sum rather than a monthly income stream; and (2) the fact that certain executive participants had not in fact attained age 62 as of the date of the change in control. The second issue is not made nonexistent just because subsection 5.1(b)(i) required "Normal Retirement Age" to be taken into consideration for the purpose of determining compensation a given executive participant would have earned had he in fact worked until that age and attained that age as of the date of change in control.

Roden urges us to disregard the actuarial principles, methods and assumptions applied by the plan actuary. He emphasizes that even assuming the plan actuary calculated the change in control benefits for other executive participants in the same manner as she had for him, this does not mean that those executive participants agreed with the manner in which their benefits were calculated; rather, some of them may have entered into settlement agreements

with AmerisourceBergen that affected their willingness to accept the sums in question as part of an overall package.

We are not here to adjudicate whether other plan participants were happy with their benefits or why they chose not to litigate the matter as has Roden. We are here to determine whether the trial court properly held that the review official had abused his discretion in construing the SERP to require taking Roden's actual age into consideration in calculating the amount of his change in control benefit. In our review of the applicable provisions of the SERP, we observe that section 2.14 requires the application of the actuarial principles, methods and assumptions applied by the plan actuary. Those principles, methods and assumptions were reasonable and not contrary to the terms of the SERP. The representation that they were applied equally to all executive participants is of interest primarily with respect to the conflict of interest issue and the weighing of that conflict in addressing abuse of discretion. The equal application of the actuarial principles, methods and assumptions to each executive participant lessens our concerns regarding the conflict of interest. However, it is immaterial whether the executive participants other than Roden were pleased with their benefits or not.

As a final point, we observe that Roden's approach fails to consider the time value of money. "In the actuarial world, this is heresy . . . ." (*Conkright v. Frommert, supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1650].) " '[Y]ounger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings.' [Citation.]" (*Hurlic v. Southern California Gas Co.* (9th Cir. 2008) 539 F.3d 1024, 1031.) One must not "ignore[] the realities of the time value of money. Under [certain defined benefit plans], younger workers have more years in which to earn interest, but must wait longer until their benefit is paid out. However, if a participant elects to receive a payout before reaching [normal retirement age], the Plan must distribute the 'actuarial equivalent' of the annuity that would be available at normal retirement age. [Citation.] This value is calculated by adding all the interest that the participant would accrue through [normal retirement age] and discounting the resulting sum to its present value. [Citation.]" (*Ibid.*) True, Roden did not, in this case, *elect* to receive an early payout, but the foregoing principles apply equally well to the situation at hand, where an early payout is *required* due to a change in control.

As AmerisourceBergen remarks, Roden's "interpretation converts the SERP from a plan designed to provide *retirement* income into a change-in-control jackpot that increases in 'value' the younger the participant happens to be . . . ." Well put. The SERP is, after all, a retirement plan.

### (7) *Conclusion regarding change in control benefit*

█ The review official, in determining the amount of the change in control benefit, applied SERP subsection 5.1(b)(i) and section 2.14 in a reasonable manner, in accordance with the actuarial principles, methods and assumptions found to be appropriate by the plan actuary. In so doing, he did not abuse his discretion. The trial court erred when it concluded to the contrary. We reverse the trial court's award of $14,432,141.74 with respect to the change in control benefit. We remand the matter to the trial court with instructions to modify the third order in implementation of judgment to affirm the review official's award of $7,503,300, less certain offsets, plus interest, as more particularly expressed in his February 6, 2009 order.

## D. *Excise Taxes and Resultant Income Taxes*

### (1) *SERP subsection 5.1(b)(iii)*

The dispute over excise taxes and resultant income taxes arises out of SERP subsection 5.1(b)(iii). That provision states in pertinent part: " 'In the event of a Change in Control, upon payment to each Executive Participant of the cash lump sum payment referred to in clause (F) of subsection 5.1(b)(i) above, the Company shall also pay to such Executive Participant . . . a cash lump sum payment equal to ([a]) the amount of excise tax for which such Executive Participant is or may become liable under Internal Revenue Code Section 4999 . . . with respect to the payments made under this Section 5.1(b) . . . plus (b) the amount of such Executive Participant's income tax liability arising from the Company's payment of the excise tax liability referred to in the preceding clause (a), such that the payments under clauses (a) and (b) taken together shall provide such Participant with sufficient after-income tax dollars to pay such Participant's liability for Internal Revenue Code Section 4999 excise taxes. . . . In the event that the Company and the Executive Participant are unable to agree upon the amount of the payment required under this subsection (iii), such amount shall be determined by Tax Counsel (as defined below). The decision of such Tax Counsel shall be final and binding upon both the Company and the Executive Participant. . . .' " (*Roden III, supra*, 155 Cal.App.4th at p. 1567, fn. 5.)

In the third appeal, Roden claimed the trial court erred in failing to award him $8,073,925.45 in excise taxes and resultant income taxes under SERP subsection 5.1(b)(iii). (*Roden III, supra*, 155 Cal.App.4th at pp. 1566–1567.) Having concluded that it was not appropriate for this court to make the tax determination *ab initio*, we remanded the matter. (*Id.* at pp. 1567, 1580.)

### (2) *Dispute between claims official and Roden*

In her decision on remand, the claims official indicated that she had reviewed the provisions of SERP subsection 5.1(b)(iii) and determined that no amount was owing to Roden with respect to taxes. She explained her interpretation of subsection 5.1(b)(iii) as follows: "I interpret the language 'is or may become liable' contained in [subsection] 5.1(b)(iii) of the SERP to mean that the excise tax has become payable or could reasonably be expected to become payable by the plan Participant . . . . [¶] I considered whether 'may become liable' should be interpreted to mean that the gross-up payment should be made if there is any possibility, however remote, that the excise tax under Section 4999 may be imposed. I reject that interpretation. That interpretation would result in a windfall to any Participant who received the gross-up payment, but who did not actually become liable for the tax. This is inconsistent with the obvious intent of the gross-up provision, which is to make executives whole for the tax should it become payable. . . ."

Roden disputed the interpretation of the claims official and demanded a $8,246,496.57 gross-up payment. Because of the dispute between Roden and herself, the claims official determined that the SERP subsection 5.1(b)(iii) resolution provision had been triggered. In other words, pursuant to the dictates of subsection 5.1(b)(iii) itself, the matter was required to be resolved by the binding determination of tax counsel.

The claims official explained to Roden: "In keeping with the SERP's requirements, I retained Rosina B. Barker of the firm Ivins, Phillips & Barker, Chtd. as Tax Counsel. Ms. Barker is an attorney at law who is a partner at Ivins, Phillips & Barker, a law firm of at least 25 attorneys, and neither Ms. Barker nor the firm of Ivins, Phillips & Barker has provided any services to either you or [AmerisourceBergen] within the last year."

### (3) *Opinion of tax counsel*

Barker prepared an opinion addressing "whether Roden could reasonably be expected to become liable for the excise tax under Internal Revenue Code . . . section 4999 upon his receipt of a Change in Control . . . benefit under the SERP." In that opinion, she explained: "[Internal Revenue] Code section 4999 imposes an excise tax on any person who receives an 'excess parachute payment' as defined by [Internal Revenue] Code section 280G(b). An excess parachute payment is defined in relevant part as a payment contingent on a change in ownership or control of a corporation, to or for the benefit of a 'disqualified individual.' I.R.C. § 280G(b)(2)(A)." Her opinion contained a detailed analysis of the applicable treasury regulations.

Barker summed up as follows: "We conclude, with a confidence level of 90% to 95% that Roden is not a disqualified individual with respect to

[Bergen Brunswig Corporation] for purposes of [Internal Revenue] Code section 280G in connection with his [change in control] benefit under the SERP. This determination is sufficient to conclude that Roden will almost certainly not be liable for excise taxes under [Internal Revenue] Code section 4999 on his [change in control] benefit . . . ."

(4) *Final determination of claims official*

The claims official accepted the opinion of tax counsel, to the effect that Roden " 'almost certainly' [would] not be liable for the excise tax. . . ." Thus, she concluded that his gross-up claim must be denied.

(5) *Determination of review official*

The review official rejected the argument that the SERP subsection 5.1(b)(iii) language requiring the company to pay a lump sum with respect to any excise tax for which a participant "may become liable" should be construed to mean that payment is due if there is any theoretical possibility that a tax could be imposed. After a discussion of the significance of the words "may" and "shall," the review official concluded: "[As AmerisourceBergen] argues, the phrase 'is or may become liable' refers to [Roden's] tax liability in the present or in the future. This interpretation is consistent with the overall purpose of the provision, which is to ensure a Participant is indemnified in the event of actual tax liability. . . . [¶] Furthermore, to interpret the provision otherwise could lead to an absurd result—i.e. a windfall payment of $8 million to [Roden]."

The review official further stated that the claims official had properly hired tax counsel and that tax counsel had provided a strong opinion that Roden would face no excise tax liability. The review official quoted tax counsel as saying: " 'A confidence level of 90 to 95% is the *highest level of certitude* I give to a Federal tax opinion. It means that the opinion is given *with virtual certainty* of its conclusion—it means that, in my professional judgment, there is *no reasonable basis* here *not even an arguable or colorable basis*—for concluding that [Roden] is a disqualified individual under [Internal Revenue] Code section 280G.' " In addition, the review official noted that Roden had not offered either a contrary legal opinion or any evidence that the government intended to pursue him for excise taxes.

The review official concluded that Roden was not entitled to a payment for excise taxes pursuant to SERP subsection 5.1(b)(iii). He added: "If there is such a tax [AmerisourceBergen] of [course] would have the duty of indemnity."

### (6) *Third order in implementation of judgment*

In the third order in implementation of judgment, the court affirmed the review official's decision concerning excise taxes and found no abuse of discretion. It explained: "As Plaintiff failed to present evidence or argument that the reasoning of Judge Lynch was somehow an abuse of discretion as to the issue of excise taxes, and as this Court agrees with Judge Lynch's analysis and reasoning, no abuse of discretion is found and the award [is] upheld in that regard."

### (7) *Roden's arguments*

### (a) *Pertaining to tax opinions*

Roden first says that he did indeed obtain an opinion of tax counsel—after the review official had rendered his determination on the matter, but while proceedings were still pending before him on attorney fees and interest issues, and *after* Roden had filed, in the superior court, a motion for a third order in implementation of judgment. Roden represents that the tax opinion he procured was contrary to Barker's opinion. However, AmerisourceBergen moved to strike the proffered opinion, arguing, inter alia, that it was untimely, never having been submitted during the administrative proceedings.

Roden represents that the trial court granted AmerisourceBergen's motion to strike. However, he does not cite any portion of the record containing a copy of the court's ruling. He also does not provide any legal argument or citation to authority to the effect that the court erred in granting the motion. Having failed to support his point with legal argument or citation to legal authority, any argument Roden might have made with respect to the ruling on the motion to strike is waived. (*Roden III, supra,* 155 Cal.App.4th at pp. 1575–1576; *R. A. Stuchbery & Others Syndicate 1096 v. Redland Ins. Co.* (2007) 154 Cal.App.4th 796, 801–802, fn. 3 [66 Cal.Rptr.3d 80] (*R. A. Stuchbery*).)

Although Roden is unable to present a countervailing tax opinion, he nonetheless argues that Barker's tax opinion is erroneous. Roden claims that the terms of the Code of Civil Procedure section 998 settlement agreement between the parties, as well as the findings of the trial court and this court to the effect that his SERP benefits were to continue for three years after he was terminated, meant that, at the time of the change in control, he continued to be an executive officer/employee subject to the parachute provisions of the Internal Revenue Code. He makes his argument without citation to legal authority. He does not cite the Internal Revenue Code, the treasury regulations, or any legal authority interpreting them. Having failed to support his

argument with citation to legal authority, it is waived. (*Roden III, supra,* 155 Cal.App.4th at pp. 1575–1576; *R. A. Stuchbery, supra,* 154 Cal.App.4th at pp. 801–802, fn. 3.)

Roden also attacks the claims official's decision to involve tax counsel. He asserts that the sole purpose of tax counsel was to calculate the amount of the tax, not to determine whether any tax was due. The review official rejected this argument as one of semantics. He said AmerisourceBergen's "position that it owed nothing because [Roden] was not liable for the tax is the same as arguing it believed the payment amount was $0. In contrast [Roden] believed the payment amount should be $8 million. Thus whether phrased in terms of a dispute over amount or whether [Roden] is entitled to any payment at all is, as [AmerisourceBergen] argues, a distinction without a difference." Roden says this analysis is just "silly" and "classic sophistry." We disagree.

The claims official had made a determination that no amount was owing to Roden with respect to excise taxes. When Roden rejected her determination, the claims official then faced a dispute over whether the amount owing was $8,246,496.57 or $0. SERP subsection 5.1(b)(iii) provides that in the event of a disagreement on the amount owing, the amount shall be determined by tax counsel. The claims official did not err in submitting the matter to tax counsel. At any rate, we observe that had she not done so, her own determination, which was adverse to Roden, would have stood.

As we have stated, to the extent the determination of tax counsel is at issue, we review the matter for abuse of discretion, because SERP subsection 5.1(b)(iii) gives tax counsel the absolute discretion to determine the amount of excise taxes and resultant income taxes owing in the event of a dispute between the parties. However, Roden, having cited no legal authority which provides us with any basis to question the analysis of tax counsel, has failed to meet his burden to demonstrate an abuse of discretion. (*Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 710 [44 Cal.Rptr.3d 702] [appellant's burden to demonstrate error].)

(b) *Pertaining to language of SERP subsection 5.1(b)(iii)*

Even so, Roden aptly notes a distinction between the opinion of tax counsel, which applies Internal Revenue Code provisions and treasury regulations to conclude that no tax is likely owing, and the determinations of the claims official and the review official, which apply the wording of SERP subsection 5.1(b)(iii) to conclude that Roden is simply not entitled to any benefit at all. As we have noted, to the extent a construction of the entitlement provisions of subsection 5.1(b)(iii) is at issue, we apply the de novo standard of review.

Roden draws our attention to the portion of SERP subsection 5.1(b)(iii) providing that "the Company shall . . . pay to such Executive Participant . . . a cash lump sum payment equal to . . . the amount of excise tax for which such Executive Participant *is or may become liable* under Internal Revenue Code Section 4999 . . . ." (Italics added.) He construes this language as an express mandate requiring the unconditional reimbursement of not just actual excise tax liability, but any potential excise tax liability as well. Roden maintains that the language is absolute and does not permit a weighing of odds. In other words, even if there is only a 5 or 10 percent chance that he could be subjected to tax, he must be paid for the amount of that potential tax, even if no tax liability ever does accrue.

As the review official observed, the word "may" is subject to more than one interpretation. On the one hand, it can be construed as relating to theoretical possibilities. Under that interpretation, Roden would be entitled to an amount on account of excise taxes were there any theoretical possibility that he might become liable for such taxes. On the other hand, the word "may" can be interpreted in a temporal sense, as relating to a future event. Under that interpretation, Roden would not be entitled to an amount on account of excise taxes unless and until he became liable for the same.

Roden insists that utilizing the temporal interpretation of the word cannot be proper in this context. He claims that AmerisourceBergen agreed to indemnify other executive participants against excise and income tax liabilities arising out of the payment of the change in control benefit. This, he contends, shows that AmerisourceBergen concedes the executive participants may become liable for the taxes. In response, AmerisourceBergen represents that the executive participants in question were employed up until the time of the change in control and that there was a greater likelihood that they would be construed as "disqualified individual[s]" within the meaning of Internal Revenue Code section 280G than that Roden would be construed as a "disqualified individual." AmerisourceBergen further represents that no tax was assessed against any of these persons. Irrespective of whether these representations are accurate, we agree with AmerisourceBergen's position that Roden's argument is illogical. The existence of any agreements to indemnify other executive participants does not prove that AmerisourceBergen believes those individuals may become liable for the tax. Rather, it underscores AmerisourceBergen's interpretation of SERP subsection 5.1(b)(iii) to the effect that it has no obligation to pay an amount with respect to excise tax unless and until the executive participants actually become liable, at some future time, for the tax. Then, AmerisourceBergen will indemnify them.

On another point, Roden notes that SERP subsection 5.1(b)(iii) requires the payment with respect to excise taxes to be made "upon payment" of the cash

lump-sum change in control benefit. In other words, determination of potential excise tax liability must be made concurrently with the determination of the amount of the change in control benefit, so that payment with respect to one can be made at the same time as payment with respect to the other. Roden further states that if payment to an executive participant is made with respect to a theoretical excise tax liability, but no excise tax is ever due, then the executive participant nonetheless retains the payment made to him, because that is the way SERP subsection 5.1(b)(iii) was drafted and that is simply part of the benefit to which the executive participant is entitled.

█ In rejecting this argument, the review official emphasized the purpose of SERP subsection 5.1(b)(iii). That subsection provides that upon payment of the change in control benefit, "the Company shall also pay . . . a cash lump sum payment equal to ([a]) the amount of excise tax for which such Executive Participant is or may become liable under Internal Revenue Code Section 4999 . . . plus (b) the amount of such Executive Participant's income tax liability arising from the Company's payment of the excise tax liability referred to in the preceding clause (a), *such that the payments under clauses (a) and (b) taken together shall provide such Participant with sufficient after-income tax dollars to pay such Participant's liability for Internal Revenue Code Section 4999 excise taxes*." (Italics added.) Clearly, the purpose of subsection 5.1(b)(iii), as the review official concluded, is to cover the executive participant's excise tax liability so that he is able to enjoy his change in control benefit without reduction on account of such tax. Paying over $8 million with respect to excise taxes that are not owing and are extremely unlikely ever to be owing does not further this purpose. We must not forget that "[a]n indemnity agreement is to be construed like any other contract with a view to determining the actual intention of the parties [citations]." (*Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.* (1981) 128 Cal.App.3d 583, 591 [177 Cal.Rptr. 268].) "The words, phrases and sentences employed are to be construed in light of the objectives and fundamental purposes of the parties to the agreement." (*Ibid.*)

Furthermore, as the review official observed, to construe SERP subsection 5.1(b)(iii) as Roden suggests would result in an absurd outcome—an $8,246,496.57 windfall. However, we must interpret a contract in a manner that is reasonable and does not lead to an absurd result. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269 [35 Cal.Rptr.3d 343].) This principle is codified in Civil Code section 1638, which provides: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.)

The review official's decision not only construed SERP subsection 5.1(b)(iii) to avoid an absurd result, it also furthered the purpose of the

provision by fully protecting Roden in the event that excise tax liability does arise. As we have noted, the review official's decision expressly provided that AmerisourceBergen would have the duty to indemnify Roden in that situation. Moreover, AmerisourceBergen, in its cross-respondent's brief, expressly states that it will indemnify Roden if he ever becomes liable for excise taxes. Roden is fully protected against liability, and his claim that indemnity is not good enough is proof of the pudding—that he wants an additional $8,246,496.57 for taxes even if no taxes ever become due. To grant that request would be to spawn an absurdity.

Although the trial court erred in applying only an abuse of discretion standard of review with respect to the various component parts of the excise tax liability analysis, it matters not. In performing a de novo review of the language of SERP subsection 5.1(b)(iii), we conclude that the review official did not err in construing the provision as requiring AmerisourceBergen to indemnify Roden, should he become liable for excise taxes and resultant income taxes in the future, but not to provide him with a current payment based on a theoretical tax liability that most likely will never materialize.

E. *Interest*

 (1) *Prejudgment interest*

 (a) *Introduction*

On remand, Roden sought interest on the principal amount of his SERP benefits at the rate of 10 percent per annum from August 29, 2001—the date of the merger, which triggered his entitlement to a change in control benefit. He cited California statutory law in support of his request. The claims official rejected his authorities and determined that the amount of interest owing from August 29, 2001 was the rate specified by title 28 United States Code section 1961(a).[2]

The review official also applied federal law, but did not construe it as requiring the application of the federal statutory rate utilized by the claims official. After a lengthy analysis of various statutory provisions, as well as provisions of the SERP, the review official chose to exercise his discretion to

---

[2] Title 28 United States Code section 1961(a) provides in pertinent part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment. . . ." Section 1961(c)(4) provides: "This section shall not be construed to affect the interest on any judgment of any court not specified in this section."

select a different interest rate—the federal bank discount rate. The trial court found no abuse of discretion with regard to the interest rate determination and affirmed the decision of the review official on that point.

In his cross-appeal, Roden contends the court erred in applying the federal bank discount rate. He maintains that the proper rate of interest is 10 percent per annum, pursuant to Civil Code sections 3287, subdivisions (a) and (b), and 3289, subdivision (a).[3] Roden further argues that ERISA law is silent with respect to prejudgment interest and that, therefore, it cannot preempt California's express policy on the matter as expressed in state statutes.

We begin our analysis with a look at section 10.15 of the SERP. It states: "Subject to ERISA, the Plan shall be interpreted, administered and enforced in accordance with the internal laws of the State of California without regard to its conflicts of laws principles." We must, then, determine whether ERISA law governs. This is a question we review de novo. (*Johnson v. Couturier* (9th Cir. 2009) 572 F.3d 1067, 1078; *Elliot v. Fortis Benefits Ins. Co.* (9th Cir. 2003) 337 F.3d 1138, 1141 (*Elliot*).)

(b) *Analysis*

"ERISA's pre-emption section, 29 U.S.C. § 1144(a), states that ERISA 'shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan' covered by ERISA." (*Egelhoff v. Egelhoff* (2001) 532 U.S. 141, 146 [149 L.Ed.2d 264, 121 S.Ct. 1322], italics added (*Egelhoff*).) The Supreme Court has concluded that ERISA's "relate to" language was not "intended to modify 'the starting presumption that Congress does not intend to supplant state law.' [Citation.]" (*De Buono v. NYSA-ILA Medical and Clinical Services Fund* (1997) 520 U.S. 806, 813 [138 L.Ed.2d 21, 117 S.Ct. 1747], fn. omitted (*De Buono*).) Roden argues that the presumption against preemption dictates the outcome in this case. We disagree, for reasons we shall show.

The courts work " 'on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." ' [Citations.]" (*De Buono, supra,* 520 U.S. at p. 813, fn. 8; accord, *Betancourt v. Storke Housing Investors* (2003) 31 Cal.4th 1157, 1165, 1167–1168 [8 Cal.Rptr.3d 259, 82 P.3d 286]

---

[3] Civil Code section 3287, subdivision (a) provides in pertinent part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." Civil Code section 3289, subdivision (b) provides in pertinent part: "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

(*Betancourt*).) Accordingly, the courts should "consider whether the state statute at issue [is] an area of traditional state regulation. [Citations.]" (*Betancourt, supra*, 31 Cal.4th at p. 1173.) "[T]he historic police powers of the State include the regulation of matters of health and safety. [Citation.]" (*De Buono, supra*, 520 U.S. at p. 814.) They also include, for example, matters of family and probate law (*Egelhoff, supra*, 532 U.S. at p. 151), as well as corporate and property law (*Ford v. Uniroyal Pension Plan* (6th Cir. 1998) 154 F.3d 613, 617 (*Ford*)). "In contrast to [such] areas [of law] . . . the calculation of prejudgment interest is not an area 'primarily of state concern' . . . ." (*Ford, supra*, 154 F.3d at p. 617.) Consequently, the preemption presumption does not dictate the outcome in this case. Our analysis does not end here, however.

■ With respect to ERISA's preemption statute (29 U.S.C. § 1144(a)), the Supreme Court has repeatedly observed that the "broadly worded provision is 'clearly expansive.' [Citations.]" (*Egelhoff, supra*, 532 U.S. at p. 146.) It has "held that a state law *relates to* an ERISA plan[, within the meaning of that statute,] 'if it has a connection with or reference to such a plan.' [Citation.]" (*Id.* at p. 147, italics added.)

Here, the state statutes at issue do not contain a reference to an ERISA plan. So, we must consider whether they have a connection to an ERISA plan. In order " 'to determine whether a state law has the forbidden connection, we look both to "the objectives of the ERISA statute . . . ," as well as to the nature of the effect of the state law on ERISA plans.' [Citation.]" (*Egelhoff, supra*, 532 U.S. at p. 147; accord, *Betancourt, supra*, 31 Cal.4th at p. 1164.)

■ In enacting ERISA, Congress, " 'established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator.' [Citation.]" (*California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.* (1997) 519 U.S. 316, 326–327 [136 L.Ed.2d 791, 117 S.Ct. 832].) Furthermore, it "intended [¶] 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . . , [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.' [Citation.]" (*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 656–657 [131 L.Ed.2d 695, 115 S.Ct. 1671]; accord, *Dishman v. UNUM Life Ins. Co. of America* (9th Cir. 2001) 269 F.3d 974, 981 (*Dishman*).)

"One of the principal goals of ERISA is to enable employers 'to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits.' [Citation.] Uniformity is impossible, however, if plans are subject to different legal obligations in different States." (*Egelhoff, supra*, 532 U.S. at p. 148.) "We recognize that all state laws create some potential for a lack of uniformity. But differing state regulations affecting an ERISA plan's 'system for processing claims and paying benefits' impose 'precisely the burden that ERISA pre-emption was intended to avoid.' " (*Id.* at p. 150.)

In *Egelhoff, supra*, 532 U.S. 141, the statute in question provided that "the designation of a spouse as the beneficiary of a nonprobate asset [was] revoked automatically upon divorce." (*Id.* at p. 143.) Because "the statute at issue [there] directly conflict[ed] with ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents," the court concluded "that the Washington statute [had] a 'connection with' ERISA plans and [was] therefore pre-empted." (*Id.* at p. 150.)

In the matter before us, the statutes in question do not conflict with ERISA requirements concerning beneficiary designations. However, they operate in the context at hand to affect the size of the benefit to be paid. Thus, they affect ERISA benefits and the determination of those benefits by plan administrators. (See *Dishman, supra*, 269 F.3d at p. 988, fn. omitted ["[p]re-judgment interest is an element of compensation . . ."]; *Ford, supra*, 154 F.3d at p. 618 [prejudgment interest "compensate[s] a beneficiary for the lost interest value of money wrongly withheld"].) It would be contrary to ERISA's goals of consistency in the processing of claims and benefits to have prejudgment interest determinations governed by individual state laws. Moreover, were we to apply the rule Roden suggests, the size of the ERISA benefit would differ depending on whether the claimant filed his suit in federal court or in state court. But this cannot be. We conclude that the state prejudgment interest statutes in question have a connection with the ERISA plan—the SERP—when applied to affect the size of the benefit awarded thereunder.

In short, "[w]hether to award prejudgment interest in suits under federal statutes is a question of federal law . . . ." (*Lorenzen v. Emp. Ret. Plan of Sperry & Hutchinson* (7th Cir. 1990) 896 F.2d 228, 236 (*Lorenzen*).) This is true even when those suits are filed in state court (*Garrow v. Connecticut General Life Ins. Co.* (1997) 456 Pa.Super. 735 [691 A.2d 943, 945–946] (*Garrow*); cf. *Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 5–7 [1 Cal.Rptr.3d 412, 71 P.3d 770]; *In re Marriage of Oddino* (1997) 16 Cal.4th 67 [65 Cal.Rptr.2d 566, 939 P.2d 1266]), and in the ERISA context in particular (*Cottrill v. Sparrow, Johnson & Ursillo, Inc.* (1st Cir. 1996) 100 F.3d 220, 224 (*Cottrill*), disapproved on another ground in *Hardt v. Reliance Standard Life*

*Ins. Co.* (2010) 560 U.S. ___ [176 L.Ed.2d 998, 130 S.Ct. 2149]; *Mansker v. TMG Life Ins. Co.* (8th Cir. 1995) 54 F.3d 1322, 1330 (*Mansker*)).

"ERISA does not expressly provide for prejudgment interest. However, prejudgment interest awards are permitted under 29 U.S.C. § 1132(a)(3)(B) (providing for 'other appropriate equitable relief'). [Citation.]" (*Mansker, supra,* 54 F.3d at p. 1330.) " 'Under ERISA, awards of . . . prejudgment interest are discretionary. . . . We review the district court's decision to award prejudgment interest . . . under an abuse of discretion standard, and reverse only if the record clearly shows an abuse of discretion.' [Citation.]" (*Ibid.,* fn. omitted.)

*Sheehan v. Guardian Life Ins. Co.* (8th Cir. 2004) 372 F.3d 962 (*Sheehan*) is instructive. In that case, having to do with the entitlement to insurance benefits, the contract was silent on whether the insurer would pay interest on benefits that were not paid when due. (*Id.* at p. 968.) The district court treated the claim for prejudgment interest as an equitable matter, pursuant to title 29 United States Code section 1132(a)(3)(B). (*Sheehan, supra,* 372 F.3d at p. 969.) The appellate court, reviewing the matter for abuse of discretion, held that the district court did not err in finding that the beneficiary was entitled to prejudgment interest. (*Id.* at pp. 968–969.) It further held that the district court properly applied the interest rate set forth in title 28 United States Code section 1961. (*Sheehan, supra,* 372 F.3d at p. 969.)

Similarly, in the case before us, the SERP does not address whether interest should be paid from the date of the change in control until the date the change in control benefit is actually paid. Certainly, it does not address any interest rate. However, the review official determined that prejudgment interest should be paid. Indeed, he noted that the parties did not dispute that some amount of interest should be paid.

As for the particular rate of interest, the review official applied the rule enunciated in *Blanton v. Anzalone* (9th Cir. 1985) 760 F.2d 989 (*Blanton*). That case provides: "In 1982, . . . Congress amended 28 U.S.C. § 1961 to provide for a post-judgment interest rate equal to that paid on 52-week U.S. Treasury bills. [Citation.] Although section 1961 does not speak to prejudgment interest, this court, . . . [citation] [has] held that the same rate should be applied to prejudgment interest 'unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate.' [Citation.]" (*Blanton, supra,* 760 F.2d at pp. 992–993.)

We recognize that not all circuits agree with the Ninth Circuit view in terms of the particular rate of interest to be applied. The Eighth Circuit, for example, applies the rate set forth in title 28 United States Code section 1961

without variation. (*Mansker, supra*, 54 F.3d at p. 1331.) The First and Fourth Circuits, on the other hand, leave it to the full discretion of the trial court to set the interest rate. (*Cottrill, supra*, 100 F.3d at pp. 224–225; *Quesinberry v. Life Ins. Co. of North America* (4th Cir. 1993) 987 F.2d 1017, 1031 (*Quesinberry*).)

However, Roden does not complain that the Ninth Circuit view is erroneous. He simply says that federal law with respect to prejudgment interest ought not be applied at all. Roden also does not argue that the review official, in implementing the view expressed in *Blanton, supra*, 760 F.2d 989, erred in determining that the equities of the case required the application of a different interest rate than the one set forth in title 28 United States Code section 1961. Again, he simply argues that the review official abused his discretion in failing to apply state, rather than federal, law. However, we have already disposed of that legal issue.

■ In determining that the application of the interest rate set forth in title 28 United States Code section 1961 would be inequitable under the circumstances, the review official considered several factors. For one, "[t]he award of prejudgment interest is necessary for full compensation of the victims of wrongdoing . . . ." (*Lorenzen, supra*, 896 F.2d at p. 236.) It "simply compensate[s] a beneficiary for the lost interest value of money wrongly withheld from him or her. [Citations.]" (*Ford, supra*, 154 F.3d at p. 618.) For another, the review official properly considered the possibility of the unjust enrichment of AmerisourceBergen, which had use of the considerable sum at issue from the date of the change in control. (*Lorenzen, supra*, 896 F.2d at p. 236.)

At the same time, the review official also took into consideration the fact that an award " 'of prejudgment interest must not result in over-compensation of the plaintiff.' . . ." (*Ford, supra*, 154 F.3d at p. 618.) "[A]n excessive prejudgment interest rate would overcompensate an ERISA plaintiff, thereby transforming the award of prejudgment interest from a compensatory damage award to a punitive one in contravention of ERISA's remedial goal of simply placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing. [Citation.]" (*Ibid.*)

The trial court did not err in finding that the review official, having taken these various factors into consideration, did not abuse his discretion in setting an interest rate above the rate established by title 28 United States Code section 1961, but below the amount of the state statutory rate Roden sought.

As a final point, Roden alternately claims the prejudgment interest rate should be applied from the date of the merger, August 29, 2001, until the date

of either the second order in implementation of judgment or the third order in implementation of judgment. The prejudgment interest rate should be paid until April 9, 2009, the date of the third order in implementation of judgment.

### (2) *Postjudgment interest*

The third order in implementation of judgment awarded postjudgment interest at 10 percent per annum, from the date of the order, without discussion of the manner of selection of the interest rate. AmerisourceBergen contends the trial court erred in awarding postjudgment interest at that rate. It asserts that title 28 United States Code section 1961 clearly governs, and the trial court has no discretion to apply a different rate. In contrast, Roden argues that the federal statute is simply inapplicable, inasmuch as it does, by its terms, apply to judgments awarded in federal district court. He claims that the trial court was correct in awarding interest at the rate of 10 percent, but incorrect as to the date from which that interest rate would run. In his cross-appeal, he contends the postjudgment interest rate should run from July 7, 2006, the date of the second order in implementation of judgment, rather than from the date of the third order in implementation of judgment. These are questions of law, which we review de novo. (*Wilkison v. Wiederkehr* (2002) 101 Cal.App.4th 822, 827 [124 Cal.Rptr.2d 631].)

Almost every case AmerisourceBergen cites for the proposition that title 28 United States Code section 1961 governs all postjudgment interest rate questions, without exception, is a case arising in federal court. (See, e.g., *Caffey v. UNUM Life Ins. Co.* (6th Cir. 2002) 302 F.3d 576; *Cottrill, supra,* 100 F.3d 220; *Quesinberry, supra,* 987 F.2d 1017; *Genworth Life & Health Ins. Co. v. Beverly* (2008) 547 F.Supp.2d 186.) Not one of those federal cases addresses the question whether the state statutory postjudgment interest rate should apply when an ERISA benefits case is filed in state court.

AmerisourceBergen cites one state court case, *Garrow, supra,* 691 A.2d 943, as squarely supporting the proposition that title 28 United States Code section 1961 dictates the rate of postjudgment interest to be applied to an ERISA judgment awarded in state court. However, the issue on appeal in that case pertained to prejudgment interest, not postjudgment interest, and the court held that the federal statute governed. (*Garrow, supra,* 691 A.2d at p. 944.) The court did state loosely that "it is appropriate in cases such as this which set forth a claim under ERISA, that the interest rate to be applied is the rate set forth under federal law." (*Id.* at pp. 945–946.) However, inasmuch as the court did not specifically address postjudgment interest, we do not give the quoted language much weight on that issue.

Roden cites no cases at all. However, he correctly observes that the federal statute specifically provides it is applicable to federal district court judgments.

This being the case, there is no reason to apply the federal postjudgment interest rate to a state court judgment, absent federal preemption.

With respect to preemption in connection with the prejudgment interest rate question, we observe, as discussed above, that prejudgment interest affects the size of the ERISA benefit. Consequently, in the context before us, the state prejudgment interest statutes at issue "relate to" an ERISA plan, within the meaning of title 29 United States Code section 1144(a), and are preempted. Inasmuch as the size of the ERISA benefit is determined pursuant to ERISA law, federal law must govern the prejudgment interest rate.

With respect to postjudgment interest, however, we have different considerations. Once a money judgment has been entered, the size of the ERISA benefit has been resolved already. All that is left is the collection of a state court judgment. " 'Postjudgment interest serves two important functions—it compensates the judgment creditor for the loss of use of the money until the judgment is paid and it acts as an incentive for the judgment debtor to pay the judgment promptly.' " (*Westbrook v. Fairchild* (1992) 7 Cal.App.4th 889, 893 [9 Cal.Rptr.2d 277]; see also *Exxon Valdez v. Exxon Mobil* (9th Cir. 2009) 568 F.3d 1077, 1080 (*Exxon*).) Since these functions pertain only to the collection of a state court money judgment, not to the determination of ERISA benefits, the state postjudgment interest rate statute is not preempted.[4]

That having been said, we turn now to the question of the date from which the 10 percent interest rate begins to accrue. In the second order in implementation of judgment, filed July 7, 2006, the court awarded Roden $14,432,141.74 in SERP benefits. In the third appeal, we affirmed the portion of the order holding that Roden was entitled to a change in control benefit and reversed the portion of the order concerning the amount of the change in control benefit. We held that the trial court had no authority to enter a damages award at that point inasmuch as the amount of the change in control benefit was required to be determined by the plan administrator in the first instance. (*Roden III, supra,* 155 Cal.App.4th at p. 1553.) Following remand, the claims official continued the process of determining the size of the entire ERISA benefit, by calculating the size of the change in control benefit. After she completed her determination, Roden sought administrative review, and ultimately trial court review. Not until that point did the trial court have the authority to enter a damages award, that is, a money judgment, with respect to the change in control benefit.

Code of Civil Procedure section 685.020, subdivision (a) provides that, except as to certain money judgments payable in installments, "interest

---

[4] Code of Civil Procedure section 685.010, subdivision (a) provides: "Interest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."

commences to accrue on a money judgment on the date of entry of the judgment." Roden interprets this statute to mean that postjudgment interest in this case begins to accrue as of the date of the July 7, 2006 second order in implementation of judgment. He is in error because, as we have explained, the court had no authority to award damages with respect to the change in control benefit, or to enter a money judgment with respect to such award, until 2009.

Roden cites cases to the effect that when an appellate court modifies a damages award, either upward or downward, postjudgment interest nonetheless accrues from the date of the original judgment. (See, e.g., *Munoz v. City of Union City* (2009) 173 Cal.App.4th 199, 203 [92 Cal.Rptr.3d 527] (*Munoz*); *Exxon, supra,* 568 F.3d at p. 1080.) But this is not a case where we modified a damages award. Rather, the effect of our third opinion was to reverse the award of damages altogether, because the trial court had no authority to award damages at that point.

 " 'When a judgment is modified upon appeal, whether upward or downward, the new sum draws interest from the date of entry of the original order, not from the date of the new judgment. [Citations.] On the other hand, when a judgment is reversed on appeal the new award subsequently entered by the trial court can bear interest only from the date of entry of such new judgment. [Citation.]' [Citation.]" (*Munoz, supra,* 173 Cal.App.4th at p. 203.) Postjudgment interest in the case before us can run only from April 9, 2009, when the trial court, after the ERISA benefits determination process finally had been completed, entered a money judgment.

F. *Application of Payments*

The third order in implementation of judgment provides: "The sum of [the $14,432,141.74] principal amount due under the SERP, plus interest at the federal bank discount rate per annum from August 29, 2001 through the date of this Order less any payments made to Mr. Roden prior to the date of this Order on account of such principal and interest shall bear interest at the rate of ten per cent (10%) per annum from the date of this Order until paid. Any payments made to Mr. Roden on account of principal and interest payable pursuant to the terms hereof shall be applied first to interest and then to the principal balance due in determining the amount of credit to which [AmerisourceBergen] is entitled."

AmerisourceBergen argues the third order in implementation of judgment errs in requiring that partial payments are to be applied first to accrued interest. To the extent that AmerisourceBergen, in framing its argument, may have been concerned that this court would hold that postjudgment interest ran

from July 7, 2006, or would affirm the $14,432,141.74 award, leaving millions of dollars left to pay postjudgment, those concerns are alleviated by this court's holdings that postjudgment interest runs from April 9, 2009, and that the trial court erred in the amount of the award. However, AmerisourceBergen also voices concerns about the treatment of certain SERP payments previously made—a $1,898,066 payment made to Roden in July 2004 and a $6,967,411.80 payment made to Roden in March 2009. AmerisourceBergen's concerns are best understood in the light of certain background information.

On July 30, 2004, Wachovia Bank paid Roden $1,898,066 with respect to amounts owing under the SERP. The treatment of that payment was addressed in the second order in implementation of judgment. In that order, the court held that Roden was entitled to a change in control benefit in the amount of $14,432,141.74, plus interest. With respect to the $1,898,066 payment, the order provided: "The Court considers the payments made by Wachovia in the amount of $1,898,060 [*sic*] to be a partial satisfaction of the judgment and that interest is payable only on the unpaid balance."

When Roden appealed from the second order in implementation of judgment, he challenged the amount of the award as being too small, but did not challenge the portion of the order regarding the partial satisfaction of the judgment and the application of interest. (*Roden III, supra*, 155 Cal.App.4th at pp. 1551, 1553.) That being the case, in the third appeal we addressed, inter alia, Roden's entitlement to a change in control benefit, but we did not address the application of the $1,898,066 payment to principal or interest. Inasmuch as Roden did not challenge this portion of the order, it is final and not subject to attack. (*League to Save Lake Tahoe v. Tahoe Regional Planning Agency* (1980) 105 Cal.App.3d 394, 399 [164 Cal.Rptr. 357]; Code Civ. Proc., § 906.) The $1,898,066 payment is to be applied to principal as of the date made. The question is whether the $6,967,411.80 payment should be treated any differently.

On March 9, 2009, AmerisourceBergen tendered to Roden a check in the amount of $5,017,682.41, representing a gross amount of $6,967,411.80, less tax withholding. AmerisourceBergen's cover letter stated: "Pursuant to the instructions given in the Review Official's Order, [AmerisourceBergen] has calculated the total SERP payment owed to Mr. Roden as of August 29, 2001, in the amount of $7,503,300. From this sum [AmerisourceBergen] has applied an offset to the SERP payment of $1,898,066 as of July 30, 2004, representing the Wachovia SERP payment of $1,898,066 received by Mr. Roden on that date. [AmerisourceBergen] has also added interest at the federal bank discount rate through today, March 9, 2009, in the amount of $1,362,177.80 which includes an offset of $236,000 as of November 30, 2002, representing repayment of Mr. Roden's executive loan. We have also

attached a summary of the calculations used to derive the amount of the SERP benefit payable to Mr. Roden, wherein these offsets and interest calculations are explained in more detail."

According to AmerisourceBergen, when it sent that letter it rightfully designated, pursuant to Civil Code section 1479, which sums were to be applied to principal and interest. Section 1479 provides in pertinent part: "Where a debtor, under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows: [¶] One—If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied. [¶] . . . [¶] Three—If neither party makes such application . . . , the performance must be applied to the extinction of obligations in the following order . . . . [¶] 1. Of interest due at the time of the performance. [¶] 2. Of principal due at that time. . . ."

Roden contends that Civil Code section 1479 is inapposite, because Code of Civil Procedure section 695.220 expressly governs the application of payments to principal and interest in this context. Code of Civil Procedure section 695.220, subdivisions (c) and (d), provides, as relevant here, that money paid in satisfaction of a money judgment is to be applied first to interest and second to principal. We agree that this statute controls the application of any payments made after the date of the third order in implementation of judgment, which is the money judgment at issue; to the extent that the third order in implementation of judgment so provides, it is correct. However, Code of Civil Procedure section 695.220, subdivisions (c) and (d), does not control with respect to payments made before the third order in implementation of judgment was entered. In other words, that statute does not control with respect to either the $1,898,066 payment made in July 2004 or the $6,967,411.80 payment made in March 2009. The application of the $1,898,066 payment, as we have stated, was resolved in the second order in implementation of judgment. Civil Code section 1479 governs the application of the $6,967,411.80 payment.

G. *Attorney Fees*

The third order in implementation of judgment provides: "The Court denies the request for attorneys' fees and costs and finds that each party had success and defeat at just about the same level. Therefore, neither side is entitled to fees or costs."

Roden claims the court erred. He says that the SERP plainly entitles him to attorney fees whether he prevails or not. However, he acknowledges that the

beneficial effect of the SERP attorney fees provision has been "blunted" by Civil Code section 1717, which requires that the litigant be determined to be the prevailing party before he can recover his attorney fees.[5] He argues, without citation to authority, that section 1717 should not be applied to strip him of an award of attorney fees and costs incurred in connection with the administrative proceedings.

AmerisourceBergen, on the other hand, draws our attention to the fact that the review official already awarded attorney fees and costs to Roden with respect to the administrative proceedings on remand after the third appeal. Although Roden acknowledges that he has received the amount the review official awarded, he contends that if he was entitled to those fees and costs, he should be entitled to fees and costs incurred over the last 10 years. However, we are not here to readdress rulings on attorney fees and costs made in prior segments of the proceedings. The only matter before us is whether the trial court ruling on attorney fees, as contained in the third order in implementation of judgment, constitutes error.

Of course, Roden contends that he is in fact the prevailing party in the litigation and that the trial court abused its discretion in holding otherwise. However, "[a]s AmerisourceBergen points out, 'the trial court " 'is given wide discretion in determining which party has prevailed on its cause(s) of action. Such a determination will not be disturbed on appeal absent a clear abuse of discretion.' " [Citation.]' [Citation.] Furthermore, the trial court has the 'power to determine that neither party prevailed. Requiring a determination for one party or the other in every case would encourage absurd results for if the court determines that neither party actually prevailed it would be unreasonable to award attorney fees.' [Citations.]" (*Roden III, supra*, 155 Cal.App.4th at p. 1578.)

At the time the third order in implementation of judgment was entered, Roden had prevailed on the amount of the change in control benefit, but had not prevailed with respect to his request for excise taxes and resultant income taxes. Furthermore, while he had prevailed with respect to the postjudgment

---

[5] Civil Code section 1717, subdivision (a), provides in pertinent part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . ." Subdivision (b)(1) of that statute provides: "The court . . . shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section."

interest rate, he had not prevailed with respect to either the prejudgment interest rate or the date from which postjudgment interest accrues. So, the third order in implementation of judgment was good news and bad news as to each of the parties. Consequently, the trial court's exercise of discretion was reasonable at the time. (*Roden III, supra*, 155 Cal.App.4th at p. 1578.) Inasmuch as we hereby reverse the ruling on the amount of the change in control benefit, the good news portion of Roden's award has decreased while the bad news portion of the award has increased. Roden has little to complain about at this point with respect to the trial court's decision not to award him attorney fees.

At oral argument, Roden made a vague comment to the effect that it was ironic he could be denied attorney fees based on Civil Code section 1717, when he would have been entitled to attorney fees under federal law. However, he has not demonstrated such an entitlement. "ERISA provides that a 'court in its discretion may allow a reasonable attorney's fee and costs of action to either party.' 29 U.S.C. § 1132(g)(1)." (*Elliot, supra*, 337 F.3d at p. 1148.) Under federal law, just as under state law, we review the court's decision on attorney fees for abuse of discretion. (*Ibid.*) We have already stated that the trial court did not abuse its discretion in denying Roden's request for attorney fees.

In addition to addressing attorney fees and costs below, Roden requests attorney fees and costs on appeal. We deny Roden's request because he is not the prevailing party on appeal.

## III

## DISPOSITION

Roden's motion to augment is denied. We reverse the portion of the third order in implementation of judgment with respect to the amount of the change in control benefit. We remand the matter to the trial court with directions to modify the portion of the third order in implementation of judgment to affirm the review official's award of $7,503,300, less certain offsets, plus interest, as more particularly expressed in his February 6, 2009 order. We affirm the portion of the third order in implementation of judgment pertaining to excise taxes and resultant income taxes. We affirm the portions of the third order in implementation of judgment applying prejudgment interest at the federal bank discount rate and applying postjudgment interest at 10 percent per annum from April 9, 2009. We affirm the portion of the third order in implementation of judgment stating that any payments pursuant thereto, in other words payments made after April 9, 2009, will be applied

first to interest and then to principal. Finally, we affirm the portion of the third order in implementation of judgment declining to award Roden attorney fees and costs. AmerisourceBergen shall recover its costs on appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied August 3, 2010, and the petition of appellant Donald R. Roden for review by the Supreme Court was denied October 13, 2010, S185191.